**In the Matter of WEIS SECURITIES, INC., Debtor.**

**Claims of George D. ALDRICH, et al.**

**No. 73 Civ. 2332.**

United States District Court,
S. D. New York.

Jan. 20, 1977.

Hughes Hubbard & Reed, New York City, for Edward S. Redington, as Trustee; James W. Giddens, James B. Kobak, Jr., David Wiltenburg, New York City, of counsel.

Theodore H. Focht, Gen. Counsel, Washington, D. C., for Securities Investor Protection Corp.; Wilfred R. Caron, Michael E. Don, of counsel.

Paul Gonson, Irving Picard, Washington, D. C., for Securities and Exchange Commission.

Milbank, Tweed, Hadley & McCloy, New York City, for New York Stock Exchange, Inc. amicus curiae; Russell E. Brooks, Martha G. Bannerman, Richard C. Tufaro, New York City, of counsel.

Dickstein, Shapiro & Morin, Washington, D. C., for Claimants Aldrich, Cohu, DeBraganca, Higginson, McGrath, McGrath, Mitchell, Stetson, Jr., Winslow, Winslow and Holden; Sidney Dickstein, Washington, D. C., of counsel.

Baer & Marks, New York City, for Claimant Fidelity Corp.; George H. Colin, New York City, of counsel.

Alan C. Winick, New York City, Lawrence Block, Thomas P. Luning, Carl A. Royal, Schiff Hardin & Waite, Chicago, Ill., for Claimants All American Life & Cas. Co., General United Life Ins. Co. and Robert E. Slater.

Patterson, Belknap & Webb, New York City, for Weis, Voisin & Co., Inc. Employees' Profit-Sharing Plan and Trust; D. Robert Owen, Arthur H. Kroll and Yale D. Tauber, New York City, of counsel.

WYATT, District Judge.

These are two appeals from an order of Bankruptcy Judge Babitt filed August 26, 1976. Appellants are (a) the trustee for the liquidation of the business of Weis Securities, Inc. (Weis) under the Securities Investor Protection Act of 1970 (SIPA, 15 U.S.C. § 78aaa and following) and (b) the Securities Investor Protection Corporation (SIPC). The order appealed from denied a motion of the trustee for summary judgment sustaining his objections to the claims of 24 different claimants who were subordinated lenders to Weis (sometimes called "claimants" and sometimes "subordinated lenders"). A thoughtful opinion had been filed by the Bankruptcy Judge on July 16, 1976. I am persuaded, however, that the able Bankruptcy Judge was in error and that the order appealed from must be reversed.

1

Weis had been a prominent registered broker-dealer and a member of the New York Stock Exchange.

The proceedings in which the trustee was appointed are described in *Exchange National Bank v. Wyatt*, 517 F.2d 453 (2d Cir. 1975). The trustee was appointed on May 30, 1973; the "filing date" (15 U.S.C. § 78eee(b)(4)(B)) was May 24, 1973. Weis is in liquidation under SIPA.

2

The securities business is much regulated, necessarily so after the 1929 stock market crash and the conditions which preceded it.

The Securities Exchange Act of 1934 (15 U.S.C. § 78a and following; the 1934 Act) required brokers to have a certain amount of capital. Section 8(b) of the 1934 Act (15 U.S.C. § 78h(b)) required that the capital of a broker firm be at least $\frac{1}{20}$ the amount of the total indebtedness of the broker firm. Expressed in another way, the 1934 Act was designed to protect the customers of a broker against his insolvency; this was to be done, among other ways, by preventing him from borrowing more than twenty times his net capital.

The New York Stock Exchange had its own rule as to net capital requirements. This was its Rule 325 which provided that the indebtedness of a member could not be more than 15 times the net capital of such member.

In 1938, the 1934 Act was amended to give the SEC authority to issue regulations with respect to the "financial responsibility" of brokers. 15 U.S.C. § 78o (c)(3). The SEC issued a regulation (17 CFR § 240.-15c3–1) which provided that no broker could have indebtedness of more than 20 times his net capital. Because the New York Stock Exchange rule was more restrictive than this, the SEC regulation was not applicable to members of that Exchange. Weis was a member of the New York Stock Exchange.

### 3

In meeting the net capital requirements of the SEC and of the Exchange, the practice developed of brokers borrowing money on a subordinated basis, that is, the lenders agreed that their claims would be subordinated to general creditors. Where such agreements were approved by the Exchange, the indebtedness was excluded in calculating compliance with the net capital rule of the Exchange. This was an explicit provision of Rule 325(b)(2)(E) of the Exchange, which excluded from the aggregate indebtedness of a member "liabilities subordinated to general creditors pursuant to a separate agreement approved by the Exchange". In substance the subordinated loans, with the knowledge of the lenders, were used as capital for purposes of the net capital rules.

Weis, in attempting to comply with the net capital rules, borrowed from lenders who agreed that their claims would be subordinated to the general creditors of Weis. Also Weis had in 1969 bought certain assets from another broker-dealer, Winslow, Cohu & Stetson Incorporated ("Winslow"). Winslow was a member of the New York Stock Exchange and had borrowed from subordinated lenders.

It should be obvious, but may bear mentioning, that subordinated lenders are paid for the added risks which they knowingly assume. They receive all income from all securities loaned, in addition to interest at rates usually above normal. Here, for example, Weis undertook to pay 10% interest to most of the lenders and not less than 8%.

We are told that in fact Weis paid $750,000 to these lenders before the trustee was appointed.

### 4

After the trustee was appointed for Weis on May 30, 1973, claims were filed by some 50 subordinated lenders to Weis.

On April 24, 1974, the trustee filed an "application for an order confirming the trustee's position with respect to claims of subordinated lenders". This position was that the subordination agreements should be enforced in accordance with their terms, that claims of fraud by the subordinated lenders even if proved would not avoid the subordination agreements because every customer and creditor of Weis had relied on those agreements "either expressly or constructively", and that the claims of subordinated lenders to Weis should not be paid until the general unsecured creditors of Weis had been paid in full.

On April 24, 1974, Judge Babitt made and filed an order requiring the subordinated lenders and SEC and SIPC to show cause why the trustee's position should not be sustained.

This order to show cause was heard on July 16, 1974. Many of the subordinated lenders did not appear to oppose the position of the trustee. As to these, there was an "inquest" and the trustee's position as to them was sustained and this proceeding is no longer concerned with them.

As to 24 subordinated lenders who opposed the trustee's position, objections to their claims were then served by the trustee and filed on December 12, 1974.

Judge Babitt then made an order on December 13, 1974 requiring the 24 subordinated lenders to show cause why summary judgment should not be granted on the objections of the trustee to their claims and why the trustee's position should not be confirmed.

The hearing on this order to show cause was held on March 12, 1975.

On July 16, 1976, Judge Babitt filed his opinion and on August 26, 1976, the order

here appealed from was filed. The order denied the trustee's motion.

## 5

Each of the subordination agreements here in question was made with knowledge that the money (or property) loaned would be used as capital of Weis for satisfying the provisions of the net capital rules. Each provided that in any liquidation of Weis, the loan would not participate in any distribution of Weis assets until the claims of all general creditors of Weis were satisfied. Each of these lenders submitted an application to the Exchange for approval as a subordinated lender. Each of the agreements was filed with the Exchange. Each was approved by the Exchange for inclusion of the borrowed money or property in calculating the capital of Weis to determine compliance with the net capital rules. None of this was disputed before the Bankruptcy Judge. One of the subordinated lenders sought to avoid the substance of his agreements by a statement that he was "unfamiliar with such requirements" of the Exchange (Slater aff. ¶ 4). Another stated that while the papers were signed and completed for the Exchange, the details were handled by Weis (Gardner aff. ¶ 4).

Now the subordinated lenders seek to avoid their subordination agreements by the claim that they were induced by the fraud of Weis to enter into those agreements. They thus ask in effect or expressly for rescission of their agreements and return of what they loaned to Weis.

The trustee contends that even if fraud on the subordinated lenders be assumed, these lenders are estopped as a matter of law to assert it because those of the public who dealt with Weis and who are now general creditors relied on compliance by Weis with the net capital rules and such compliance was made possible only by the agreements to subordinate. The trustee also contends that the subordination provisions were promises to the Exchange which relied on them in allowing Weis to continue as a member and to deal with those who

thereby became general creditors in the present liquidation.

## 6

In denying the trustee's motion, Judge Babitt ruled that actual reliance by the general creditors on the subordination agreements or net capital rule must be proved by the trustee in order to defeat the claims of fraud by the subordinated lenders. Judge Babitt also ruled that if the trustee can establish "an independent contract" between the subordinated lenders and the Exchange, "that contract will remain in force regardless of any fraud perpetrated by Weis".

It is far from clear how the ruling of the Bankruptcy Judge is intended to be applied. Must the trustee prove actual reliance by each customer creditor? Would failure to prove actual reliance by any *one* customer creditor mean that the subordination agreements could be rescinded as against all customer creditors or only as to that one customer creditor as to whom there was failure of proof? We are told by the trustee that there were 30,000 customers of Weis and by SIPC that there were 33,000 such customers. Would the trustee be required to prove actual reliance on each one of the subordination agreements of each subordinated lender? What would be the effect of a failure of proof as to one subordination agreement of one subordinated lender?

Normally these questions would be reached only after a trial of the fraud issue as to each subordinated lender and after at least one subordinated lender had established fraud by Weis. As to any subordinated lender who fails to prove fraud by Weis, the inquiry would normally be ended and the subordination agreement could be enforced according to its terms.

It seems, however, that the Bankruptcy Judge has in mind a reversal of this order of events. The trustee is first to prove reliance by the customer creditors. If he can do this, then proof of fraud will not be taken because irrelevant. If the trustee does not prove reliance, then the fraud issue is then to be tried as to each subordinated

lender. If this be the contemplated procedure it seems illogical and unworkable.

It is not clear exactly what procedure is contemplated. However, the practical result of the ruling of the Bankruptcy Judge is clear. The burden of proof on the trustee could not be met as a practical matter and thus the subordination agreements, on the strength of which Weis had been allowed to continue operating and to create claims of general creditors, could not be enforced.

### 7

Judge Babitt concluded that "the controlling case" is *In re Credit Industrial Corp.,* 366 F.2d 402 (2d Cir. 1966). It is believed that this conclusion is mistaken.

CIC, a commercial finance company, obtained its working capital by borrowing from (a) institutions and (b) individuals. The individual lenders were paid "a high rate (10%–12%) of interest" but their loans were agreed to be subordinated to institutional loans and not to be paid until CIC paid all its obligations to institutional lenders. CIC became a bankrupt. Its trustee sought to enforce the subordination agreement. The individual lenders asserted several *separate* defenses, two of which are significant here: (a) that the institutions did not lend to CIC in reliance on the subordination agreement and (b) that fraud was practiced on the individual lenders. The District Court had affirmed the denial of a motion to strike the defense described in (a) and the granting of a motion to strike the defense described in (b). The District Court believed that any subordination agreement, however valid or lawful, could only be enforced in bankruptcy if actual reliance on the agreement by senior creditors could be shown. Under this belief, it was irrelevant whether fraud could be proved by the subordinated (individual) lenders because, whether there were fraud or not, reliance by the senior (institutional) lenders had to be shown.

The Court of Appeals reversed, holding that in bankruptcy the Court "must enforce lawful subordination agreements according to their terms" (366 F.2d at 410). There-

fore, the separate defense described in (a) above should have been struck.

It was also held that the separate defense of fraud described in (b) above should not have been struck because the pleading stage was too early to decide whether proof of fraud would avail the subordinated (individual) lenders; this "should await such disposition as the law and facts require after the relevant facts have been developed" (366 F.2d at 412).

The Court of Appeals did discuss but *did not decide* whether reliance must be shown to overcome a defense of fraud asserted by junior creditors. Such a defense was allowed to be asserted as a matter of pleading because it "*may* become important to the rights of junior creditors" (366 F.2d at 410–11; emphasis supplied); therefore "the noteholders here are entitled to assert" such a defense in their pleading (366 F.2d at 411). Elsewhere the Court of Appeals said: "Reliance *may* become a relevant factor . . . where the subordination agreement itself is invalid" (366 F.2d at 409; emphasis supplied).

There was thus no decision by the Court of Appeals on the point here at issue; the discussion was dicta, and the decision is not controlling in the case at bar.

In any event, the situation in *CIC* was radically different from that at bar. In *CIC,* the subordination ran in favor of particular, described senior creditors and the motives for subordination were entirely private, having nothing to do with statutory requirements for a regulated business. In the case at bar, Weis and the subordinated lenders knew that the subordination was to meet the statutory requirements for a broker-dealer to continue in business and knew that it was for the protection of the general class of Weis customers who, as long as Weis continued to operate, were becoming general creditors of Weis.

### 8

There is not only no controlling authority on the point here at issue; there are no decisions on the point.

We must consider, therefore, what equity and fairness would suggest. This seems clearly to be that, as between the customer and other general creditors of Weis on the one hand (for whom the trustee speaks) and the subordinated lenders on the other, the agreements of the latter should be enforced according to their terms in distributing the assets of Weis. As between Weis and the subordinated lenders, the latter are entitled to rescind if fraud is proved; the trustee recognizes this. If the subordinated lenders prove fraud, their claims should be paid before anything is distributed to the stockholders of Weis. But the customer and other general creditors of Weis should be paid before anything is paid to the subordinated lenders. Every customer and general creditor of Weis knew, or is presumed to have known, that the broker-dealer business of Weis was regulated by federal law and that as part of such regulation the net capital rule was enforced. The subordinated lenders, by their agreements, enabled Weis to comply with the net capital rule and thus to continue in business. The customer and general creditors of Weis should therefore have priority. Under the circumstances, actual reliance is not required to be shown. If the reliance doctrine must be satisfied as a point of dogma, it should be presumed as a matter of law.

The bank assessment cases seem analogous. Before 1959 (for all practical purposes, before 1933), for many years shareholders of any national bank were by statute personally liable for "all contracts, debts, and engagements" of the bank, to the extent of the par value of their shares; this liability was enforced by assessment. 12 U.S.C. §§ 63, 64.

Cases arose where shareholders defended against an assessment on the ground that their shares were sold by fraud of the bank to them and, since fraud gave them a right of rescision, they were not really to be considered as shareholders. No such defense was allowed because the statutory liability was for the protection of depositors of the bank. It was never suggested that actual reliance on the share ownership or the statutory liability had to be shown.

Such a case was *Scott v. Deweese,* 181 U.S. 202, 21 S.Ct. 585, 45 L.Ed. 822 (1901) where (at 213, 21 S.Ct. at 589) it was said:

"The present suit is primarily in the interest of creditors of the bank. It is based upon a statute designed not only for their protection but to give confidence to all dealing with national banks in respect of their contracts, debts and engagements, as well as to stockholders generally. If the subscriber became a shareholder in consequence of frauds practised upon him by others, whether they be officers of the bank or officers of the Government, he must look to them for such redress as the law authorizes, and is estopped, as against creditors, to deny that he is a shareholder, within the meaning of § 5151, if at the time the rights of creditors accrued he occupied and was accorded the rights appertaining to that position."

A more recent and similar case is *Oppenheimer v. Harriman Bank,* 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042 (1937). Both sides appear to rely on this decision but in my view it supports the position of the trustee. Oppenheimer bought his stock in 1930. The bank closed in 1933 after which Oppenheimer sued for rescission for fraud and eventually secured a money judgment for the amount he had paid for the shares. The Court of Appeals, however, ordered that the judgment be paid only "after payment in full of all who were creditors when the bank became insolvent". This deferment of the judgment was reversed by the Supreme Court which ruled that the judgment was entitled to parity with other unsecured creditors. This ruling was made, however, *because Oppenheimer had already paid the statutory assessment against him.* The significance for the case at bar is the repetition by the Supreme Court of the settled rule that fraud and the ability to rescind are of no avail to defeat protections by statute for a class of creditors. The Supreme Court, citing *Scott v. Deweese,*

**218**

above, with approval, said (301 U.S. at 214, 57 S.Ct. at 724):

"Plaintiff appeared by the bank's records to be a stockholder and, as against creditors for whose benefit the statutory liability was created, was estopped from denying that status. Recognizing that the bank's fraud and his rescission availed nothing against the comptroller's assessment, plaintiff paid the amount laid against him."

Nothing whatever was said about reliance by creditors on the share ownership or statutory liability.

An even closer analogy is found in an old New York case, *Hurd v. Kelly,* 78 N.Y. 588 (1879). A bank was in poor condition. To induce and enable the bank to continue in business Kelly gave the bank a bond, under circumstances strikingly similar to those here. As described in the opinion (at 595):

"It appears that when the bond was given the assets of the bank had become impaired to an amount as great or greater than the amount of the bond. The bond was executed for the purpose of being exhibited to the bank department as an asset so that the bank might pass the examination and inspection of the department and be enabled to continue its business."

Later the bank failed and a receiver was appointed who sued on the bond. Kelly defended by asserting that he was induced by fraud to sign the bond. This was unanimously held to be no defense, the Court saying (at 596, 597):

"The intention of the parties was to provide a security in the nature of a guarantee fund of $100,000, to enable the bank to continue its business. It is not claimed that the transaction was *ultra vires,* and if it was, that objection cannot prevail as against the claims of depositors who are represented by the receiver and who is seeking to collect the bond as an asset of the bank, for distribution among those for whose protection it was given. . . .

"The defense that there was a fraudulent concealment by the persons who solicited the defendant to sign the bond, of

the true condition of the bank, was, under the circumstances of this case, no answer to the action. It appears from the defendant's answer that he was informed, when he executed the bond, that it was to be used in reference to the relations of the bank to the banking department 'so that a better showing of the apparent assets of the bank would appear.' The defendant was thus apprised that this bond was to be used to give credit to the bank, with the bank department and with the public, so that it should be enabled to continue its business. The fact communicated to him was notice that the bank was in a precarious condition. He knew that if the bond was treated as an asset and the bank thereby allowed to continue its business, new obligations to depositors would be entered into on the faith of the solvency of the institution. Under such circumstances it would be gross injustice to permit the defendant, after having aided the bank to procure credit with the community, to avoid, as against depositors and creditors, the payment of his bond on the allegation that the exact condition of the bank was not disclosed to him, or that it was much worse than was represented. The dealings between him and the officials of the bank, at whose request he signed the bond, ought not, in justice, to be allowed to affect the security given by him for the protection of those dealing with the bank and who must be presumed to have relied thereon in their dealings."

It may be noted that the receiver was not required to show that any depositor in fact knew of Kelly's bond or relied in any way on it. To the contrary, the depositors "must be presumed to have relied thereon in their dealings".

**9**

■ Separate consideration should perhaps be given to an additional argument made by the Weis Employees' Profit-Sharing Plan and Trust ("Trust"), one of the subordinated lenders. The Trust argues that its claim should not be subordinated

because it falls in, or close to, the category of "wages" given a priority status by Section 64(a)(2) of the Bankruptcy Act (11 U.S.C. § 104(a)(2)). The term "wages" in this section has not been liberally construed but has been limited to "money directly due [employees] in back wages." *United States v. Embassy Restaurant*, 359 U.S. 29, 32, 79 S.Ct. 554, 556, 3 L.Ed.2d 601 (1959). Contracts in which an employees' trust loans money to the employer at higher than normal interest rates in return for its agreement to subordinate its claim to that of all other creditors scarcely falls within the classic pattern of "back wages".

The order appealed from is reversed and the matter is remanded to the Bankruptcy Judge for further proceedings consistent with this opinion.

SO ORDERED.