In the Matter of WEIS SECURITIES, INC., Debtor.

George D. ALDRICH, H. Wallace Cohu, John De Braganca, James J. Higginson, Grace Cutting McGrath, Grace M. McGrath, Craig K. Mitchell, Eugene W. Stetson, Jr., Jean M. Winslow, Samuel Winslow, Estate of Phillip D. Holden, deceased, Fidelity Corp., General United Life Insurance Co., All American Life & Casualty Co., Robert Slater, Eva Grossman, Arthur Kreizel, and Weis, Voisin & Co., Inc. Employees' Profit-Sharing Plan and Trust, Claimants-Appellants,

v.

Edward S. REDINGTON, Trustee, and Securities Investor Protection Corporation, Appellees.

Nos. 36, 37, 39, 40, 41 and 42, Dockets 77–6034, 77–6038, 77–6044, 77–6045, 77–6048 and 77–6065.

United States Court of Appeals, Second Circuit.

Argued Oct. 21, 1977.

Decided June 12, 1978.

Thomas P. Luning, Chicago, Ill. (Lawrence Block, Carl A. Royal, and Schiff, Hardin & Waite, Chicago, Ill., and Alan C. Winick, New York City, on the brief), for appellants All American Life & Casualty Co., General United Life Insurance Co., and Robert Slater.

Fred F. Herzog, Sp. Asst. Atty. Gen., State of Illinois, Chicago, Ill. (Mary F. Stafford and Robert G. Epsteen, Asst. Attys. Gen., State of Illinois, Chicago, Ill., on the brief), for appellant Eva Grossman.

James B. Kobak, Jr., New York City (James W. Giddens, David W. Wiltenburg, and Hughes, Hubbard & Reed, New York City, on the brief), for appellee Edward S. Redington, Trustee.

Paul Gonson, Associate Gen. Counsel, Securities and Exchange Commission, Washington, D. C. (Harvey L. Pitt, Gen. Counsel, Irving H. Picard, Asst. Gen. Counsel, Sue E. Auerbach and Angela M. Desmond, Attys., Securities and Exchange Commission, Washington, D. C., on the brief), for appellee Securities and Exchange Commission.

Theodore H. Focht, Gen. Counsel, Securities Investor Protection Corp., Washington, D. C. (Wilfred R. Caron, Associate Gen. Counsel, and Michael E. Don, Senior Atty., Washington, D. C., on the brief), for appellee Securities Investor Protection Corporation.

Milbank, Tweed, Hadley & McCloy, Russell E. Brooks, Richard C. Tufaro, and Samuel H. Gillespie, III, New York City, filed a brief for New York Stock Exchange, Inc., amicus curiae, in support of Trustee.

Patterson, Belknap, Webb & Tyler, Arthur H. Kroll, Yale D. Tauber, and D. Robert Owen, New York City, filed a brief for appellant Weis, Voisin & Co., Inc. Employees' Profit-Sharing Plan and Trust.

Baer, Marks & Upham, Robert K. Ruskin, and Jeffrey L. Liddle, New York City, filed a brief for appellant Fidelity Corp.

Before WATERMAN, MULLIGAN and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

The chief question presented on this appeal is whether the claims of certain subordinated *lenders* to a broker-dealer now in liquidation should be enforced in accordance with the subordination agreements to which the lenders were parties, regardless of whether *customers* of the broker-dealer could show reliance on the subordination agreements. We hold that such subordination agreements must be enforced in accordance with their terms.

The appeal is from a judgment entered January 20, 1977 in the Southern District of New York, Inzer B. Wyatt, *District Judge,* 425 F.Supp. 212, which upheld the trustee's position with respect to the claims of the subordinated lenders. In so doing, Judge Wyatt reversed an order of Roy Babitt, *Bankruptcy Judge,* which had denied the trustee's motion for summary judgment. Judge Wyatt directed that the matter be remanded to the bankruptcy court for further proceedings consistent with Judge Wyatt's opinion. We agree with the trustee's position as upheld by Judge Wyatt. We affirm.

### I.

In summarizing those facts and prior proceedings necessary to an understanding of our rulings on the legal issues presented, we assume familiarity with Judge Wyatt's clear, comprehensive opinion cited above.

The proceedings in the district court began as an enforcement action commenced May 23, 1973 by the Securities and Exchange Commission (SEC) against Weis Securities, Inc. (Weis) pursuant to Section 21(e) of the Securities Exchange Act of 1934[1] and Section 20(b) of the Securities Act of 1933.[2] In that action[3] the SEC's complaint sought to enjoin Weis and certain of its officers from continuing violations of the antifraud and net capital provisions of the Exchange Act[4] and the Commission's rules thereunder.[5] The SEC's complaint also requested the appointment of a temporary receiver for the assets and the books and records of Weis.

On May 24, the day after the SEC enforcement action was commenced, the Securities Investor Protection Corporation (SIPC) filed an application in the SEC action, pursuant to § 5(a)(2) of the Securities Investor Protection Act of 1970 (SIPA),[6] requesting that the court adjudicate under § 5(b)(1) that the customers of Weis were in need of the protection afforded by SIPA and that the court appoint a trustee and an attorney under § 5(b)(3). See *SEC v. Alan F. Hughes, Inc.,* 461 F.2d 974 (2 Cir. 1972).

1. 15 U.S.C. § 78u(e) (1970) [now Section 21(d), 15 U.S.C. § 78u(d) (1976)].

2. 15 U.S.C. § 77t(b) (1970) [now Section 20(b), 15 U.S.C. § 77t(b) (1976)].

3. The jurisdictional underpinning for the action is provided in Section 27 of the Exchange Act, 15 U.S.C. § 78aa (1976), and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) (1976).

4. Sections 10(b) and 15(c)(3), 15 U.S.C. §§ 78j(b) and 78*o*(c)(3) (1976).

5. Rules 15c3–1, 17a–3, 17a–4, 17a–5 and 17a–11, 17 CFR §§ 240.15c3–1, 240.17a–3, 240.17a–4, 240.17a–5, 240.17a–11 (1977).

6. 15 U.S.C. § 78eee(a)(2) (1976).

Unless otherwise indicated, all citations to SIPA are to sections thereof, as here, e. g., to § 5(a)(2). SIPA has been codified at 15 U.S.C. §§ 78aaa–78*lll* (1976).

On May 30 the court (then District Judge, now Circuit Judge, Murray I. Gurfein) made the requested adjudication. He appointed Edward S. Redington as trustee to oversee the orderly liquidation of the remaining assets of Weis. The proceedings in which Mr. Redington was appointed as trustee are more fully set forth in *Exchange National Bank of Chicago v. Wyatt,* 517 F.2d 453, 455 (2 Cir. 1975) (Friendly, *J.*).

Backing up for a moment, during the period from June 28, 1967 to May 7, 1973, each of the lenders here involved entered into agreements with Weis which subordinated their accounts with, or loans to, Weis, to the claims of all creditors of Weis—both then existing creditors and future ones as well. In connection with all such subordination agreements the lenders submitted for approval written applications to the Board of Governors of the New York Stock Exchange (NYSE), together with opinions of counsel stating that the subordination agreements were valid and enforceable.

In consideration of the added risks inherent in the subordination, the agreements provided that the lenders were to receive interest at attractive rates on the principal amounts of the loans. As a group, the lenders received under the subordination agreements approximately $750,000 in interest.

The subordination agreements were important in that they enabled Weis to comply with the net capital rules of the SEC[7] and of the NYSE,[8] and thus to continue to deal with the public. The purpose of the net capital rules is "to require that the capital position of a broker or dealer will always be sufficiently liquid to cover his current indebtedness, in order to be able at all times to promptly meet the demands of customers." Securities Exchange Act Release No. 8024 (Jan. 18, 1967). Specifically, the net capital rules limit the aggregate indebtedness of regulated member firms to fifteen times their net capital. If the appropriate ratio is not met, the broker or dealer may not continue operations. In computing a firm's net capital (net worth minus nonliquid assets), subordinated property is not treated as a liability against the firm, but as an unencumbered capital asset. This treatment of subordinated property as an unencumbered asset is predicated on the assumption that such property is readily available to satisfy customers' claims.

In the instant case, the subordination agreements constituted a substantial part of Weis' net capital. As such, they were a *sine qua non* of Weis' compliance with the net capital rules and of the firm's being permitted to continue to deal with the public.

---

7. Rule 15c3–1(a) under the Exchange Act, 17 CFR § 240.15c3–1(a) (1977), provides:

"No broker or dealer shall permit his aggregate indebtedness to all other persons to exceed 1500 percentum of his net capital, except as otherwise limited by the provisions of subparagraph (a)(1), or, in the case of a broker or dealer electing to operate pursuant to paragraph (f) of this section, no broker or dealer shall permit his net capital to be less than 4 percent of aggregate debit items as computed in accordance with § 240.15c3–3a of this Chapter, except as otherwise limited by paragraph (f) of this section, and every broker or dealer shall have the net capital necessary to comply with the following conditions, except as otherwise provided for in paragraph (f) of this section."

8. NYSE Rule 325 in relevant part provides:

"(a) Each member or member organization subject to Rule 15c3–1 promulgated under the Securities Exchange Act of 1934 shall comply with the capital requirements prescribed therein and with the additional requirements of this Rule 325.

(b) Each member or member organization subject to this Rule shall forthwith notify the Exchange if his or its net capital after deduction of all capital withdrawals including maturities, if any, scheduled during the next six months, falls below the pertinent percentage indicated below:

1. If the net capital minimum dollar amount requirement is applicable—150 percent thereof or some greater percentage as may from time to time be designated by the Exchange, or

2. If the ratio of aggregate indebtedness to net capital is applicable—10 percent of aggregate indebtedness, or

3. If the specified percentage of the aggregate debit items in the Formula for Determination of Reserve Requirements for Brokers and Dealers under Securities and Exchange Commission Rule 15c3–3 is applicable—7 percent of the aggregate items thereunder . . . . ."

After Weis' fraud was disclosed, the lenders attempted to rescind their subordination agreements. They claimed that they had been fraudulently induced to enter into the agreements in violation of common law and the Exchange Act.[9] Such rescission, if permitted, would have placed the lenders in the same position in the liquidation proceeding as unsubordinated creditors and customers.

The trustee moved in the bankruptcy court for summary judgment to enforce the subordination agreements on the ground that the lenders were estopped from rescinding the agreements, regardless of whether customers and general creditors had relied on the agreements. For purposes of the motion, it was assumed that Weis fraudulently had induced the lenders to enter into the agreements.

In an opinion filed July 16, 1976, the bankruptcy judge denied the trustee's motion. The judge held that reliance by customers and creditors would give rise to an estoppel which would bar rescission; but whether there had been such reliance was a question of fact which precluded summary judgment. From the order entered in the bankruptcy court on August 23, 1976 denying summary judgment, the trustee appealed to the district court.

In an opinion filed January 20, 1977, Judge Wyatt reversed the bankruptcy court's denial of summary judgment, holding that reliance by customers and creditors, if necessary at all, should be conclusively presumed as a matter of law; and that the subordination agreements should be enforced according to their terms in distributing the assets of Weis. *In the Matter of Weis Securities, Inc.,* 425 F.Supp. 212, 217 (S.D.N.Y.1977).

For reasons stated more fully below, we agree with Judge Wyatt that *customers* of Weis need not show reliance on the subordination agreements to prevent rescission by the lenders. Since the remaining assets of Weis will be exhausted after satisfaction of the customers' claims, it is unnecessary to reach the question whether *general creditors* must prove reliance in order to prevent rescission. We find no merit in the separate claims raised by several of the appellants referred to below. We affirm the judgment of the district court in all respects.

II.

In the light of the foregoing summary of the facts and prior proceedings, we turn directly to the issue which is common to all appellants:[10] whether the claims of subordinated lenders to' a federally regulated broker-dealer now in liquidation should be enforced in accordance with the subordination agreements to which the lenders were parties, regardless of whether customers of the broker-dealer could show reliance on the subordination agreements as a condition to estopping the lenders from rescinding the agreements on grounds of fraud.

The lenders contend that they may not be prevented from rescinding on the basis of fraud unless the customers can show reliance on the situation that turns out to be fraudulent. We recognize that proof of detrimental reliance may be a prerequisite to the application of the doctrine of equitable estoppel. *E. g., Fey v. Walston & Co., Inc.,* 493 F.2d 1036, 1050 (7 Cir. 1974); *Royal Air Properties, Inc. v. Smith,* 333 F.2d 568, 570 (9 Cir. 1964). In this Circuit, the principle was applied in *In re Credit Industrial Corp.,* 366 F.2d 402 (2 Cir. 1966). There junior creditors sought priority in a bankruptcy proceeding because of the illegality of the agreement under which they had subordinated their interests. We stated the standard for requiring reliance as follows:

"Reliance may become a relevant factor where equitable considerations require its consideration, namely, where the subordination agreement itself is invalid

9. Section 10(b), 15 U.S.C. § 78j(b) (1976), and Rule 10b–5, 17 CFR § 240.10b–5 (1977).

10. We shall discuss below the separate claims raised by appellants Eva Grossman; Weis, Voisin & Co., Inc. Employees' Profit-Sharing Plan and Trust; and Fidelity Corporation.

. . . . When a junior creditor establishes that the subordination agreement is unlawful, *it may be reasonable and necessary,* if equity is to be done, to require a senior creditor to prove that he relied on the subordination agreement, without actual or constructive knowledge of any infirmity in the agreement, in advancing funds to the bankrupt as a condition to receiving priority in the distribution of the bankrupt's estate. In cases where the underlying subordination agreement is unlawful, a court is not confronted with the problem of enforcing express contractual provisions but, rather, with the entirely separate problem of determining which general creditors should bear a loss caused by the debtor, a problem which *may* have to be resolved by reference to equitable principles." (emphasis added) (citations omitted).

*Id.* at 409.

Unlike *Credit Industrial Corp.,* however, the instant case involves the attempted rescission of a promise or obligation intended to allow a company to satisfy regulatory requirements and of promises made by the company to regulatory authorities. We therefore have an additional factor—regulatory interests—to consider in determining whether it is here "reasonable and necessary" to require reliance on the subordination agreements. Our inquiry must focus on whether the element of reliance has any place in the regulatory scheme of Congress.

In this connection we find relevant, as the district court did, a series of cases arising under the National Banking Act. Prior to 1959, shareholders of a national bank were statutorily liable for all obligations of the bank to the extent of the par value of their shares.[11]

In *Scott v. Deweese,* 181 U.S. 202 (1901), such a shareholder sought to rescind his purchase of bank stock on the ground that he had been fraudulently induced by the bank to buy his shares. The Court held that he was estopped from doing so on the ground that one who purchased bank shares must be conclusively presumed to have known that he had increased the bank's capital and had facilitated its conduct of business. *Id.* at 212. The Court was careful to point out that the congressional policy reflected in the statute required a bright-line delineation of priority:

"The present suit is primarily in the interest of creditors of the bank. It is based upon a statute designed not only for their protection but to give confidence to all dealing with national banks in respect of their contracts, debts and engagements, as well as to stockholders generally. If the subscriber became a shareholder in consequence of frauds practised upon him by others, whether they be officers of the bank or officers of the Government, he must look to them for such redress as the law authorizes, and is estopped, as against creditors, to deny that he is a shareholder, within the meaning of section 5151, if at the time the rights of creditors accrued he occupied and was accorded the rights appertaining to that position."

*Id.* at 213. Whether the bank creditor had relied on the bank's capitalization was irrelevant. *Accord, Anderson v. Cronkleton,* 32 F.2d 170, 172–73 (8 Cir. 1929) ("The statute . . . serves a general public purpose, viz., to give stability to the national banking system . . . . If stockholders were permitted to show . . . , in order

---

11. Section 63 of the National Banking Act, 12 U.S.C. § 63 (1958) [repealed in 1959], in relevant part provided:

> "'The shareholders of every national banking association shall be held individually responsible . . . for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares . . . .'"

The lenders argue that this statute is distinguishable from the federal securities laws in that the former's "clear language" imposed an "absolute liability" on the stockholders. There is no basis for this distinction. The National Banking Act did not refer to the fraudulent inducement of contributions to required capital amounts any more explicitly than the Exchange Act does.

to escape liability under the statute, that they became stockholders through fraud . . . the foundation of a national bank would be undermined, and its public function impaired."). *Cf. Hurd v. Kelley,* 78 N.Y. 588, 597 (1879) (same with respect to a New York state bank).[12]

In these cases the courts recognized a legislative intent to encourage the public transactions upon which the well-being of the economy largely depends by bolstering public confidence in the integrity of financial institutions. To assure creditors that they could rely on the stated capital resources of a bank, the legislature compelled those who had contributed capital to stand by their commitments. In order faithfully to effectuate the legislative policy, the courts held that no condition should be placed on the creditors' priority; they concluded that shareholders were absolutely estopped from rescinding their obligations.

The same legislative solicitude for the interests of customers is present in the instant case. As stated above, pursuant to its congressional mandate to police the integrity of the nation's securities markets, the SEC has promulgated a rule which makes the ability of a securities broker to conduct business contingent upon the maintenance of certain capital levels. In the same net capital rule, the SEC has proscribed the rescission of subordinated loan agreements "by mutual consent or otherwise."[13] At least to the same extent as under the National Banking Act, the regulatory authorities here are motivated by a strong desire to assure investors of the stability and integrity of the securities markets and of the broker-dealers responsible for channeling investments into them. As with the courts

which interpreted the National Banking Act, we find no suggestion of a congressional intent to make the priority to which customers of a broker-dealer are entitled contingent on anything—and certainly not on the necessity of proving reliance on specific elements of a broker-dealer's assets. In short, we decline to blur the bright-line rule fashioned to further a public objective of the utmost importance.

Our holding in this respect is grounded on considerations of sound public policy. As the SEC points out in its excellent brief, to require proof of actual reliance would exacerbate the problem of impermanent capital in the brokerage community—one of the more significant causes of broker-dealer failures during the 1969–70 period. Study of Unsafe and Unsound Practices of Brokers and Dealers, H.R.Doc.No.231, 92d Cong., 1st Sess. 49 (1971). Moreover, there would be continuing uncertainty as to the financial responsibility of broker-dealers whose capital rests on subordination agreements.

In view of these considerations, sanctioning a reliance requirement in the instant case would be inconsistent with *In re Credit Industrial Corp., supra.* Proof of reliance here clearly is not "reasonable and necessary". 366 F.2d at 409. To hold otherwise, in the asserted exercise of our equitable powers, would be contrary to public policy.

■ We hold, under this section of our opinion, that where a lender subordinates his loan to a securities broker—to enable the broker to comply with regulatory capital requirements—he is estopped from rescinding the subordination agreement. Whether customers relied on the subordina-

---

12. *Oppenheimer v. Harriman National Bank & Trust Co.,* 301 U.S. 206 (1937), relied upon by the lenders, is not to the contrary. There the Court held that a defrauded stockholder was entitled to rank on a parity with other unsecured creditors. *Id.* at 215. However, this right was held to have accrued only after vindication of regulatory interests by his payment of the statutory liability to those creditors:

"Plaintiff appeared by the bank's records to be a *stockholder and, as against creditors for whose benefit the statutory liability was created,* was estopped from denying that status.

Recognizing that the bank's fraud and his rescission availed nothing against the comptroller's assessment, plaintiff paid the amount laid against him." *Id.* at 214.

13. Rule 15c3–1d(c)(1), 17 CFR § 240.15c3–1d(c)(1) (1977).

Weis was not formally subject to this rule because the SEC found that it was subject to NYSE Rule 325, which is even more comprehensive than the SEC rule. Securities Exchange Act Release No. 3617 (Nov. 8, 1944).

tion agreement is irrelevant. We affirm Judge Wyatt's holding on this issue.

### III.

We turn next to the separate claims raised by certain of the appellants. See note 10, *supra.*

#### (A) CLAIM OF APPELLANT EVA GROSSMAN

■ First, Mrs. Grossman contends that, because of her asserted lack of sophistication in financial matters, as a lender she should have been treated by the district court differently from the other lenders. She works as a fitter in a Chicago department store. She says that when she purchased $20,000 of Weis subordinated debentures she did not fully understand the benefits and risks of her investment. She concedes that she did know that her investment as a loan to Weis would return about the highest rate of interest of any investment she could make. At oral argument before us, her attorney acknowledged that she had received several thousand dollars in interest during the six years she had owned the debentures prior to the liquidation of Weis. She nevertheless argues that, because of her peculiar lack of sophistication, she never became a party to a subordinated debenture agreement; and that she actually was a general creditor or customer of Weis within the meaning of § 6(c)(2)(A)(ii) of SIPA.[14] We find no merit in this contention and hold that there is no basis for treating Mrs. Grossman any differently than the other lenders.

■ Second, Mrs. Grossman contends that, since all the assets of Weis, Voisin, Cannon Inc. (the predecessor of Weis) were transferred to Weis without notice to her, such transfer violated the Illinois and New York Bulk Sales Acts. Ill.Rev.Stat. ch. 26, §§ 6–101 et seq.; N.Y. U.C.C. §§ 6–101 et seq. If the Bulk Sales Acts were applicable, noncompliance with their terms would render the transfer voidable at Mrs. Grossman's option. *Corrigan v. Miller*, 338 Ill.

App. 212, 217, 86 N.E.2d 853, 856 (1949). We hold, however, that neither Bulk Sales Act is applicable here. Both Acts are intended to apply only to enterprises "whose principal business is the sale of merchandise from stock. . . ." N.Y. U.C.C. § 6–102(3); Ill.Rev.Stat. ch. 26, § 6–102(3). Weis was a broker engaged in transactions which involved investment securities. It did not sell goods or merchandise. See N.Y. U.C.C. § 8–102; Ill.Rev.Stat. ch. 26, § 8–102. We therefore find no merit in this contention.

■ Third, Mrs. Grossman contends that under common law the funds which she says Weis fraudulently induced her to subordinate are held by Weis and its successors under a constructive trust for her benefit. It is elementary, however, that before a constructive trust may arise, there must be a *res*—a segregated fund or property—to which the trust can attach. A.L.I., Restatement of Restitution § 160, comment i (1937). Here there was nothing more than the opening of an account for Mrs. Grossman. No funds were segregated for her account. Absent a *res*, there could be no constructive trust. We therefore find no merit in this contention.

We have carefully considered the other arguments urged by Mrs. Grossman and find them to be without merit.

#### (B) CLAIM OF APPELLANT WEIS, VOISIN & CO. INC. EMPLOYEES' PROFIT–SHARING PLAN AND TRUST

Weis, Voisin & Co. Inc. Employees' Profit-Sharing Plan and Trust (the Trust) is a tax-qualified retirement plan which provided part of the compensation, paid by Weis in the form of contributions, for eligible Weis employees. The Trust used these funds to extend a total of $95,000 in subordinated loans to Weis. Under the terms of the liquidation of Weis, the Trust will be terminated and the employees will receive a distribution of their interest in its assets.

The Trust contends that the subordinated loans it made to Weis are in substance

---

**14.** 15 U.S.C. § 78fff(c)(2)(A)(ii) (1976).

wages owed by Weis, through the Trust, to eligible former employees. Accordingly, it asks us to accord to such loans the priority status conferred on "wages" by Section 64(a)(2) of the Bankruptcy Act, 11 U.S.C. § 104(a)(2) (1976).

The district court held, 428 F.Supp. at 219, that the term "wages" in this context is limited to "money directly due [employees] in back wages", citing *United States v. Embassy Restaurant*, 359 U.S. 29, 32 (1959); and that a contract whereby an employees' trust loans money to an employer at higher than normal interest rates in consideration of subordination is not within the classic pattern of "back wages". We agree.

(C) CLAIM OF APPELLANT FIDELITY CORPORATION

On January 21, 1971, Fidelity Corporation (Fidelity) entered into an agreement with Weis pursuant to which Fidelity extended a $1,000,000 loan in consideration of a subordinated promissory note and an undertaking by Weis to sell insurance exclusively for Fidelity. Beginning October 1972, Weis sold insurance for others in violation of this agreement. On October 12, Weis entered into a new agreement with Fidelity to repay the entire loan on November 2, 1972. When the repayment became due, Weis refused to pay it.

Fidelity contends that it may claim rescission of its subordination agreement, not only on grounds of fraud, but also on grounds of material breach of contract and failure of consideration. It urges that it should be treated as an unsecured general creditor. Alternatively, it contends that the new unsubordinated agreement of October 12 should place it in the position of a general creditor.

We hold that Fidelity, whose claim is conditioned upon a subordination agreement, is in the same position as the other lenders; and that its arguments based on breach of contract and failure of consideration are without merit.

We have carefully considered all claims of all appellants, and we find them without merit.

Affirmed.