685 F.2d 270
 FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of
Franklin National Bank, Appellant,
v.
UNITED STATES NATIONAL BANK, a National Banking Association;
Federal Deposit Insurance Corporation, as Receiver
of United States National Bank, et al., Appellees.
 No. 80-6043.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 1, 1982.
Decided Aug. 23, 1982.
 
 Jeffery M. Epstein, New York City, for appellant.
 Charles A. Legge, Bronson, Bronson & McKinnon, San Francisco, Cal., for appellees.
 Appeal from the United States District Court for the Southern District of California.
 Before SKOPIL and SCHROEDER, Circuit Judges, and KING,* District Judge.
 SCHROEDER, Circuit Judge:
 
 
 1
 This case is yet another eddy in the whirlpool of litigation that followed the 1973 collapse of the United States National Bank in San Diego, California.[1] In this litigation the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver of another failed bank, Franklin National Bank, is suing itself, in its capacity as receiver of U.S. National Bank, to recover $5,000,000 which the U.S. National Bank allegedly borrowed by means of fraudulent representations. The district court granted summary judgment against the plaintiff and we reverse.
 
 FACTS
 
 2
 In 1972, United States National Bank ("USNB") merged with Beverly Hills Fidelity Bank. In connection with the merger, USNB required additional capital. On June 30, 1972, Franklin National Bank ("FNB") loaned $5,000,000 to USNB, in return for $5,000,000 worth of USNB capital notes, as evidenced in a written contract entitled "Subordinated Capital Note Agreement." These notes bore interest at a rate of 1/2% above FNB's prime rate. Under the agreement the notes were expressly subordinated to the payment of "senior obligations" in the event of USNB's failure. The loans were authorized under USNB's Articles of Association and were approved by the Comptroller of the Currency as complying with the requirements of the National Banking Act ("NBA").
 
 
 3
 On October 18, 1973, the Comptroller of the Currency closed U.S. National Bank, and appointed the FDIC as receiver. FDIC as receiver of USNB ("USNB Receiver"), entered into a purchase and assumption agreement with Crocker National Bank, whereby Crocker purchased certain assets and assumed certain liabilities of USNB. In order to implement the purchase and assumption agreement the USNB Receiver obtained a loan from the FDIC as corporation, and granted the FDIC a lien on the remaining assets retained by the USNB Receiver.
 
 
 4
 FNB began this suit on November 26, 1973, claiming that it was induced to enter into the Subordinated Capital Note Agreement by reason of misrepresentations on the part of USNB. Approximately one year later, on October 8, 1974, the Comptroller of the Currency declared FNB insolvent and appointed FDIC as receiver of FNB as well.
 
 
 5
 FDIC, as receiver of FNB ("FNB Receiver"), is in the process of winding up the affairs of that failed bank, and thus now prosecutes this action standing in the shoes of FNB. It filed FNB's amended complaint alleging fraud in connection with the Subordinated Capital Note Agreement and seeks rescission of the agreement and return of the $5,000,000 paid by FNB to purchase the capital notes, plus interest.
 
 
 6
 On June 17, 1980, the USNB Receiver filed an amended answer which asserted as an affirmative defense that the FNB Receiver was barred from recovering damages from the USNB Receiver until the FDIC loan was completely satisfied. The balance due on the FDIC loan exceeds $200,000,000 and the remaining assets held by the USNB Receiver are approximately $100,000,000. Thus there will in all likelihood be a deficit in the FDIC loan of approximately $100,000,000. Due to that deficit, if the USNB Receiver prevails in this defense, the FNB Receiver will recover nothing.
 
 
 7
 Shortly after filing that answer, the USNB Receiver moved for summary judgment on the affirmative defense. For purposes of the motion, the FNB Receiver and the USNB Receiver stipulated that USNB had made fraudulent representations to FNB which would permit rescission of the note agreement under applicable law, and that holders of "senior liabilities" as defined in the Subordinated Capital Note Agreement did not rely on the subordination provisions contained in that agreement.
 
 
 8
 On November 14, 1980, the district court granted summary judgment in favor of the USNB Receiver, and held that the claim of the FNB Receiver must be deferred to the prior payment in full of the FDIC. The FNB Receiver filed a timely notice of appeal.
 
 DISCUSSION
 
 9
 The principal issue is whether the FNB, assuming that it was fraudulently induced to make a subordinated loan, is entitled to share in the ratable distribution of assets to creditors afforded by §§ 91 and 194 of the NBA, 12 U.S.C. §§ 91, 194.[2]
 
 
 10
 FNB Receiver's threshold argument is that, although the note agreement expressly subordinates FNB's right of payment to all "senior liabilities," the FDIC loan is not included in that class of obligations because nothing in the note agreement expressly subordinates FNB's right of payment to the prior payment in full of the FDIC loan.
 
 
 11
 This argument is not consistent with the terms of the note agreement itself. The definition of senior liabilities contained in the note agreement includes:
 
 
 12
 All Banking Liabilities, and obligations to the FDIC and any rights acquired by the FDIC as a result of loans made by the FDIC to the Company or the purchase or guarantee of any of the Company's assets by the FDIC pursuant to the provisions of Title 12, United States Code, Section 1823, Paragraphs (c), (d) or (e) ....
 
 
 13
 Because the FDIC purchase and assumption transaction was conducted pursuant to 12 U.S.C. § 1823(e), the note agreement clearly contemplates subordination of the $5,000,000 FNB loan to the rights of the FDIC.
 
 
 14
 We therefore must consider FNB Receiver's principal argument, which deserves closer analysis and which we find to be meritorious. Appellant's argument is that, as a defrauded subordinated noteholder entitled to rescission of the loan agreement under applicable law, it assumes the position of a general creditor allowed to benefit from 12 U.S.C. § 194. That section provides for a "ratable dividend" on all claims proved to the satisfaction of the receiver. Since the ratable distribution in this case took the form of a purchase and assumption by Crocker Bank of the assets and liabilities of USNB, ratable distribution would assure FNB of total repayment.[3]
 
 
 15
 Assuming as we must by virtue of the parties' stipulation that appellant's subordinated position was the product of fraud, then its entitlement to status as a general creditor is fully supported by the Supreme Court's decision in Oppenheimer v. Harriman National Bank & Trust Co., 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042 (1937). There the plaintiff was fraudulently induced to buy stock in a bank. The bank failed and the plaintiff rescinded the sale of stock and sought to recover against the bank on the same level as other unsecured creditors. The Court first required plaintiff to comply with NBA § 64 (since repealed), requiring stockholders to pay an assessment up to the par value of their stock to protect creditors who relied upon the state capital. After paying the Comptroller's assessment, the Court held that plaintiff was entitled to "stand on the same footing as other creditors. Discrimination against (creditors') claims is not authorized by the statute. It follows that plaintiff's judgment is entitled to rank on a parity with other unsecured creditors' claims." Id. at 215, 57 S.Ct. at 724.
 
 
 16
 USNB Receiver argues that Oppenheimer provides no support for appellant's position, and cites several lower court decisions, all interpreting different regulatory schemes, where defrauded holders of corporate obligations were not allowed to join the class of unsecured creditors. Particular reliance is placed upon In re Weis Securities, Inc., 425 F.Supp. 212 (S.D.N.Y.1977), aff'd, 605 F.2d 590 (2d Cir. 1978), which arose in the context of the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa et seq.
 
 
 17
 In Weis, subordinated lenders brought an action against the trustee of a failed broker-dealer claiming fraud and seeking rescission of their subordination agreements. The broker-dealer had borrowed money on a subordinated basis so that the amount of this indebtedness would not be considered in the determination of the broker-dealer's compliance with the "net capital rules" of the SEC and the New York Stock Exchange. These rules limited a broker's indebtedness to a certain multiple of its net capital. Because subordinated liabilities, approved by the Exchange, were not added to indebtedness, "(i)n substance the subordinated loans, with the knowledge of the lenders, were used as capital for purposes of the net capital rules." 425 F.Supp. at 214.
 
 
 18
 The district court in Weis held that despite any fraud which might entitle the lenders to rescission, customers and general creditors of Weis should be paid before subordinated lenders because every customer and general creditor knew, or was presumed to have known, that under federal law Weis was required to maintain a certain level of capital. The subordinated lenders provided capital to Weis with the express understanding that their funds enabled Weis to comply with the rule. Id. at 217. The Second Circuit affirmed the district court, holding that when a lender subordinated a loan made to a securities broker to enable the broker to comply with regulatory capital requirements, the lender was estopped to rescind the subordination agreement. Whether customers actually relied on the subordination agreement was "irrelevant." 605 F.2d at 596-97.
 
 
 19
 As noted by the Second Circuit, the purpose of the net capital rules was to assure a broker's ability to meet the demands of its customers by limiting aggregate indebtedness to a specific amount greater than the firm's net capital. The subordinated loans were not treated as liabilities against the firm, but as unencumbered capital assets, helping the firm meet the net capital rule, and giving the firm the right to continue dealing with the public. Id. at 593.
 
 
 20
 We therefore cannot agree with the USNB Receiver or the district court that the present case is analogous to Weis. In Weis, subordinated loans were made to the failed broker-dealer for the specific purpose of ensuring the broker-dealer's compliance with the net capital rules. The lenders were aware that the amounts of their loans would not be added to the firm's aggregate indebtedness for purposes of determining compliance.
 
 
 21
 The record in this case does not suggest that FNB subordinated its loan to enable USNB to comply with regulatory capital requirements. A loan for that purpose was not possible under the provisions of the NBA and relevant regulations. NBA § 82[4] limits the aggregate indebtedness of a national bank to an amount not exceeding its unimpaired capital stock plus 50% of its unimpaired surplus funds (with certain exceptions not here relevant). This provision, standing alone, bears superficial resemblance to the capital requirement in Weis. However, 12 C.F.R. § 14.5(b),[5] then in effect, specifically stated that the amount of outstanding capital debentures should be added to the amount of other indebtedness for purposes of meeting the test of § 82. The Comptroller's approval of FNB's loan did not exclude the loan amount from the § 82 calculation and therefore differed from the Exchange's approval in Weis.
 
 
 22
 We therefore disagree with the district court's characterization of the regulatory interest in this case as similar to that in Weis. The regulatory interest in Weis was to protect customers of broker-dealers through net capital requirements. Because the lenders' loans were specifically subordinated so as to allow the broker-dealer to meet these requirements, the regulatory interest mandated denial of the lenders' attempt to elevate their position to the level of other creditors, even though it was assumed that they had been fraudulently induced to make the loans. Here, the FNB loan could not have been made for the purpose of complying with NBA § 82. It could not have been relied upon as capital by general creditors of USNB. FNB is therefore not estopped from claiming rescission of the note agreement.[6]
 
 
 23
 The next question is whether the FNB Receiver, despite its ability to rescind, may nevertheless be barred from participating in the ratable dividend scheme of NBA §§ 91 and 194. USNB Receiver asserts that because FNB's claim was not fixed on the books of USNB on the date that USNB failed, there was no obligation on the part of USNB's receiver to include FNB in the ratable distribution by purchase and assumption.
 
 
 24
 The same argument was met and rejected by this court in First Empire Bank v. FDIC, 572 F.2d 1361 (9th Cir.) (as amended), cert. denied, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978), which also arose from the USNB collapse. In that case, USNB creditors whose claims had not been assumed by Crocker brought suit against the FDIC. The creditors were holders of standby letters of credit and claimed that the purchase and assumption by Crocker amounted to a distribution under § 194 in which they were entitled by law to share ratably. The FDIC responded that the creditors' claims were contingent and were not debts of USNB at the time of its insolvency or at the time it was placed in receivership.
 
 
 25
 We held in First Empire that the plaintiff's claims were provable in the receivership because (1) they were in existence before insolvency and were not dependent on any new contractual obligations arising later; (2) the liability on the claims was absolute and certain in amount when the suit was filed against the receiver; and (3) the claims against the receiver were made in a timely manner well before any distribution of the assets of the receivership other than the distribution through the purchase and assumption agreement. Id. at 1367, 1369.
 
 
 26
 This rationale clearly applies to the present case. The transaction giving rise to the claim for rescission occurred prior to the insolvency and was not dependent on any new contractual obligations arising later. Since fraud was assumed for the summary judgment motion, the liability was absolute and certain in amount when the suit was filed. The rescission claim was timely made prior to the distribution of the assets other than the purchase and assumption transaction. We therefore conclude that, under First Empire, the fact that FNB's claim was not "on the books" on the date of the bank's failure is not a bar to its claim for ratable distribution.
 
 
 27
 USNB Receiver next argues that Congress's regulatory interests, as expressed in the seemingly straightforward ratable distribution language of NBA § 194, are somehow modified by, or secondary to, two provisions of the later-enacted Federal Deposit Insurance Act (FDIA), 12 U.S.C. § 1821(d) and § 1823(e). We disagree.
 
 
 28
 Section 1821(d) charges the FDIC, in winding up the affairs of a closed bank, to "pay ... to depositors and other creditors the net amounts available for distribution to them ...." USNB Receiver claims that the phrase "depositors and other creditors" does not allow for distributions to holders of subordinated notes. We have concluded, however, that the FNB's right to rescind the subordination agreement entitles it under Oppenheimer to stand on the same level as other creditors.
 
 
 29
 Section 1823(e) gives the FDIC the ability to enter into a purchase and assumption transaction. The USNB Receiver argues that this section gives the FDIC a priority over any claim that FNB might have to a ratable distribution. In answer to this, we again turn to this court's decision in First Empire. In that case we refused to give the FDIC priority over other claims on the basis of § 1823(e). We stated that " § 1823(e) cannot be read to excuse the FDIC as the Receiver from complying with the provisions of the NBA." 572 F.2d at 1370. The court noted that the concept of a purchase and assumption agreement had not been created with the passage of the FDIA: "Congress in enacting the FDIA thus noted a pre-existing practice. We find nothing to suggest that in doing so Congress intended the FDIC to be free from the requirements of § 91 and § 194 by which prior receivers had been bound in the formulating and execution of agreements." Id. at 1371. We therefore hold that the obligations of USNB receiver under § 194 are not affected in the manner it suggests by the provisions of the FDIA.
 
 CONCLUSION
 
 30
 The Supreme Court's decision in Oppenheimer and this Circuit's decision in First Empire demonstrate that the ratable distribution language of NBA § 194 does not provide a statutory preference to one group of creditors over any other. A ratable dividend is to be made on all claims proved to the satisfaction of the receiver. Absent the regulatory interests present in Weis, we are persuaded that FNB Receiver can participate in a § 194 distribution on the same level as any other creditor, provided that it can show that its $5,000,000 loan was fraudulently induced. We therefore reverse the judgment of the district court and remand for further proceedings consistent with this opinion.
 
 
 31
 Reversed and remanded.
 
 
 
 *
 Honorable Samuel P. King, Chief Judge, United States District Court for the District of Hawaii, sitting by designation
 
 
 [1]
 Numerous suits have arisen out of the demise of U. S. National Bank. In particular, this court has decided the following:
 Westgate-California Corp. v. First Nat'l Finance Corp., 650 F.2d 1040 (9th Cir. 1981); Little v. Valley Nat'l Bank, 650 F.2d 218 (9th Cir. 1981); In re Westgate-California Corp., 642 F.2d 1174 (9th Cir. 1981); In re Westgate-California Corp., 634 F.2d 459 (9th Cir. 1980); Trone v. Smith, 621 F.2d 994 (9th Cir. 1980); FDIC v. First Nat'l Finance Corp., 587 F.2d 1009 (9th Cir. 1978); Harmsen v. Smith, 586 F.2d 156 (9th Cir. 1978); First Empire Bank v. FDIC, 572 F.2d 1361 (9th Cir.), cert. denied, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978); FDIC v. Sovereign State Capital, Inc., 557 F.2d 683 (9th Cir. 1977); Trone v. Smith, 553 F.2d 1207 (9th Cir. 1977); Harmsen v. Smith (Harmsen I ), 542 F.2d 496 (9th Cir. 1976); Little v. First California Corp., 532 F.2d 1302 (9th Cir. 1976).
 
 
 [2]
 12 U.S.C. § 91 provides:
 All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void; and no attachment, injunction, or execution, shall be issued against such association or its property before final judgment in any suit, action, or proceeding, in any State, county, or municipal court.
 12 U.S.C. § 194 provides:
 From time to time, after full provision has been first made for refunding to the United States any deficiency in redeeming the notes of such association, the comptroller shall make a ratable dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction, and, as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated; and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association, or their legal representatives, in proportion to the stock by them respectively held.
 
 
 [3]
 It is clear that the NBA requirement of ratable distribution applies to the purchase and assumption transaction. As we stated in First Empire Bank v. FDIC, 572 F.2d 1361, 1370 n.3 (9th Cir.) (as amended), cert. denied, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978), a case also arising out of the collapse of USNB:
 It is the proceeds of a purchase of receivership assets that must be ratably distributed under § 194. Here receivership assets (including the cash borrowed from the Corporation) were sold in exchange for Crocker's assumption of debts. That assumption, then, as proceeds of the sale, constitutes a distribution of assets which must give ratable recognition to the rights of creditors of the receivership.
 
 
 [4]
 12 U.S.C. § 82 provides:
 No national banking association shall at any time be indebted, or in any way liable, to an amount exceeding the amount of its capital stock at such time actually paid in and remaining undiminished by losses or otherwise, plus 50 percent of the amount of its unimpaired surplus fund, except on account of demands of the nature following:
 First. Notes of circulation.
 Second. Moneys deposited with or collected by the association.
 Third. Bills of exchange or drafts drawn against money actually on deposit to the credit of the association, or due thereto.
 Fourth. Liabilities to the stockholders of the association for dividends and reserve profits.
 Fifth. Liabilities incurred under the provisions of the Federal Reserve Act.
 Sixth. Liabilities incurred under the provisions of the Federal Deposit Insurance Act.
 Seventh. Liabilities created by the indorsement of accepted bills of exchange payable abroad actually owned by the indorsing bank and discounted at home or abroad.
 Eighth. Liabilities incurred under the provisions of sections 1031-1033 of this title.
 Ninth. Liabilities incurred on account of loans made with the express approval of the Comptroller of the Currency under paragraph (9) of section 84 of this title.
 Tenth. Liabilities incurred under the provisions of section 352a of this title.
 Eleventh. Liabilities incurred in connection with sales of mortgages, or participations therein, to the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.
 Twelfth. Liabilities incurred in borrowing from the Export-Import Bank of the United States.
 
 
 [5]
 12 C.F.R. § 14.5, since rescinded, provided:
 § 14.5 Capital debentures
 (a) It is the policy of the Comptroller of the Currency to permit the issuance of convertible or nonconvertible capital debentures by national banking associations in accordance with normal business considerations.
 (b) Subject to the provisions of 12 U.S.C. 82, the bank may, with the approval of stockholders owning two-thirds of the stock of the bank, entitled to vote, or without such approval if authorized by its Articles of Association, issue convertible or nonconvertible capital debentures in such amounts and under such terms and conditions as shall be approved by the Comptroller: Provided, however, That the principal amount of capital indebtedness outstanding at any time, when added to all other outstanding indebtedness of the bank, except those forms of indebtedness exempt from the provisions of 12 U.S.C. § 82, shall not exceed an amount equal to 100 percent of the bank's unimpaired paid-in capital stock plus 50 percent of the amount of its unimpaired surplus fund.
 
 
 [6]
 We are aware that the Weis court cites the Oppenheimer decision for support because Oppenheimer involved the claim of a shareholder rather than a lender. Congress's regulatory interest in protecting the capital relied upon by creditors was satisfied in Oppenheimer by requiring the shareholder to pay a statutory assessment (the par value of his shares) before his claim for rescission would be entertained. That regulatory interest does not exist here, where the NBA and regulations promulgated thereunder precluded the possibility that the $5,000,000 loan could be looked to as security by other creditors. The $5,000,000 loan, like all other debt, was subject to the maximum indebtedness provisions of § 82 and 12 C.F.R. § 14.5