GRANT COUNTY SAVINGS & LOAN ASSOCIATION, Sheridan, Arkansas, Plaintiff,

v.

The RESOLUTION TRUST CORPORATION as Receiver for Savers Federal Savings & Loan Association, and The Resolutions Trust Corporation as Conservator for Savers Savings Association, Defendants.

No. LR–C–90–595.

United States District Court, E.D. Arkansas, W.D.

July 29, 1991.

Frank H. Bailey, Mountain Home, Ark., for plaintiff.

Harry Light, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

SUSAN WEBBER WRIGHT, District Judge.

This is a declaratory judgment action in which Grant County Savings & Loan Association (Grant County) seeks a determination that the amounts it owes the Resolution Trust Corporation (RTC) as Conservator for Savers Savings Association (Savers Savings) under certain loan participation agreements should be offset against an amount represented by a Receiver's Certificate issued to Grant County by the RTC as Receiver for Savers Federal Savings & Loan Association (Savers Federal). The RTC as Conservator counterclaims for the amounts due on the participation agreements.

The right to setoff is properly decided on cross motions for summary judgment. As required by Rule 56 of the Federal Rules of Civil Procedure, there is no genuine issue as to any material fact.

## I. FACTUAL BACKGROUND

In 1984 Grant County purchased a loan participation in the Woodlake Manor project from Savers Federal for $490,-859.24. On May 24, 1988, Grant County filed a complaint against Savers Federal to rescind its participation interest in the Woodlake Manor project based on Savers Federal's constructive fraud and breach of fiduciary duty.

On October 4, 1989, before Grant County's case was tried, the Office of Thrift Supervision (OTS) appointed the RTC as Receiver for Savers Federal. On the same date the OTS approved the creation of Savers Savings. Immediately thereafter the

RTC as Receiver for Savers Federal entered into a Purchase and Assumption Agreement with Savers Savings under which substantially all of the assets as well as the deposits and secured liabilities of Savers Federal were sold to and assumed by Savers Savings. The OTS then appointed the RTC as Conservator for Savers Savings.

Grant County also was a participant with Savers Federal in five other projects known as Alta Vista, Days Inn (Broken Arrow), Stadium View, Snowden Place, and Eighth Avenue Medical Center (collectively, the Other Projects). At the time of the receivership, Grant County owed Savers Federal $211,012.10 for Grant County's pro rata share of expenses in connection with these projects. On October 5, 1989, pursuant to the Purchase and Assumption Agreement and 12 U.S.C. § 1821(d)(2)(F)(i), the Other Projects, as well as the accounts receivable due from Grant County for expenses associated with the participation agreements, were transferred to Savers Savings and are now owned by the RTC as Conservator for Savers Savings. Savers Savings did not, however, assume any liability for the Woodlake Manor claims.

Five months later, on March 5, 1990, Grant County and the RTC as Receiver settled the Woodlake Manor lawsuit. Under the terms of the settlement agreement, the RTC as Receiver issued a Receiver's Certificate to Grant County and Grant County conveyed its interest in the Woodlake Manor project to the RTC as Receiver. The agreement also provided that Grant County's claim evidenced by the Certificate shall be deemed a proven claim within the meaning of 12 U.S.C. § 1821(d)(5)(B). In exchange for the foregoing, Grant County released the RTC as Receiver and as Conservator from any and all claims relating to the Woodlake Manor project. Neither party admitted liability.

On August 23, 1990, Grant County filed this lawsuit asking the Court to determine that it may setoff the amounts it owes the RTC as Conservator against its claim for $490,859.24 on the Receiver's Certificate issued by the RTC as Receiver. On April 10, 1990, the RTC as Conservator withheld $49,992.42 from the proceeds of the sale of the Eighth Avenue Project for expenses owed by Grant County on the participation agreements. The parties have stipulated that if the Court determines that Grant County does not have the right of offset against the Receiver's Certificate, the RTC as Conservator is entitled to judgment on its counterclaim against Grant County in the amount of $113,637.19 for participation expenses due as of April 30, 1991.

## II. DISCUSSION

The RTC claims that Grant County is not entitled to setoff because: (1) at the time Savers Federal was placed into receivership, Grant County's claims were not mutual, concurrent, and certain; (2) setoff is barred by 12 U.S.C. § 1823(e) and federal common law under *D'Oench, Duhme & Company, Inc. v. F.D.I.C.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); (3) Grant County's claims can only be asserted against the RTC as Receiver for Savers Federal; and (4) Grant County waived and released its right to assert its claims against assets held by the RTC as Conservator. Each of these issues will be addressed in turn.

### A. The Ripeness of Grant County's Claim for Setoff

The rights of the parties became fixed at the time the RTC as appointed as Receiver of Savers Federal and the right to setoff is governed by the state of things existing at that time, not by conditions thereafter arising. *See Dakin v. Bayly*, 290 U.S. 143, 148–49, 54 S.Ct. 113, 115, 78 L.Ed. 229 (1933); *Northwest Racquet Swim & Health Clubs, Inc. v. RTC*, 927 F.2d 355, 360 n. 14 (8th Cir.1991). The general rule is that contingent claims are not the proper subject of setoff. *FDIC v. Liberty Nat'l Bank & Trust Co.*, 806 F.2d 961, 968 (10th Cir.1986). Moreover, setoff is justified only if the two claims or demands "mutually exist between the same parties," *FDIC v. Texarkana Nat'l Bank*, 874 F.2d 264, 269 (5th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 837, 107

L.Ed.2d 833 (1990), and are "in the same right," *Adams v. RTC*, 927 F.2d 348, 353 n. 14 (8th Cir.1991), or "in the same capacity so as to prevent unjust results as an offset of a trust account to reduce the trustee's debt," *Interfirst Bank Abilene, N.A. v. FDIC*, 777 F.2d 1092, 1095 (5th Cir.1985).

The RTC argues that any liability of Savers Federal to Grant County was nothing more than a contingent liability which did not become fixed or certain until five months after Savers Federal was declared insolvent when the parties entered into the settlement agreement. Thus, since Grant County did not have a liquidated claim against the Savers Federal at the time of the insolvency, there were no mutual, certain, and concurrent liabilities which could be offset against the liquidated amount it owed Savers Federal. *See Stokes v. Home Life Ins. Co.*, 187 Ark. 972, 973, 63 S.W.2d 657, 658 (1933) ("A contingent liability cannot be set off against an uncontingent liability. The liabilities to be set off must be mutual, certain, and concurrent.")[1]

██ Grant County's claims of fraud and breach of fiduciary duty related to the Woodlake Manor project were not contingent in the sense that the general rule contemplates, since Grant County's right to rescind was not "in any way dependent on events occurring after insolvency." *Liberty Nat'l Bank*, 806 F.2d at 968. The liability of Savers Federal stems from events prior to insolvency, not from settlement of the lawsuit after insolvency.

In a similar case, the Fifth Circuit in *Interfirst Bank* held that a participating bank could set off the amounts of the participations against debts owed to the lead bank if the claim was "provable" and the debts were "mutual." 777 F.2d at 1094–95. The participating bank (Interfirst) had purchased participations in four loans, two of which were fraudulent. After the lead bank was declared insolvent, the FDIC made a demand on Interfirst for funds held in a correspondent checking ac-

count, to which Interfirst responded by exercising a setoff. Interfirst filed suit seeking a declaratory judgment to approve the offset as to the two fradulent loans.

The court of appeals found Interfirst to be entitled to setoff because its claim was provable, and because it satisfied the mutuality requirement for setoff. A claim is provable if

> (1) it exists before the bank's insolvency and does not depend on any new contractual obligations arising later; (2) liability on the claim is absolute and certain in amount when suit is filed against the receiver; and (3) the claim is made in a timely manner, well before any distribution of the assets of the receivership other than a distribution through a purchase and assumption agreement.

777 F.2d at 1094 (citing *First Empire Bank v. FDIC*, 572 F.2d 1361, 1367–69 (9th Cir.), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978)). Interfirst asserted provability on two grounds. First, the FDIC stipulated to fraud and gross negligence as to the loans at issue, thus establishing a "clear[ ] pre-insolvency breach of contractual obligation, giving rise to a liquidated claim by Interfirst against Ranchlander [the lead bank]." *Id.* Alternatively, Interfirst claimed rescission based on fraud. Relying on *FDIC v. United States Nat'l Bank*, 685 F.2d 270, 276 (9th Cir.1982) (transaction giving rise to claims for rescission occurred prior to insolvency and was not dependent on any new contractual obligations arising later), the court concluded that "Interfirst's fraud claim also pre-dated Ranchlander's insolvency and was absolute in amount when Interfirst filed suit, as required by *First Empire.*" *Id.* at 1095 (citation omitted). The court upheld Interfirst's actions under either of the bases argued, finding also the required "mutuality" of obligations making setoff appropriate. *Id.*

As in *Interfirst* and *United States National Bank*, the transaction giving rise to

---

1. Federal law governs the validity of setoff, *FDIC v. State Bank of Virden*, 893 F.2d 139, 142 (7th Cir.1990), but in most respects federal common law refers to general equitable principles,

*FDIC v. Mademoiselle of California*, 379 F.2d 660, 662–63 (9th Cir.1967), and state law, *Interfirst Bank*, 777 F.2d at 1094, for guiding principles.

the claim for rescission occurred prior to insolvency and was not dependent on any new contractual obligations arising later. The fraud allegedly occurred at the time of Grant County's participation in the Woodlake Manor project. Grant County's claim for rescission based upon fraud also predated the insolvency of Savers Federal and, as reflected by the Receiver's Certificate issued as a result of the settlement, RTC's liability was absolute and certain in amount when the suit was filed against the receiver. The rescission claim also was made in a timely manner, before any distribution of the assets of the receivership other than through a purchase and assumption agreement.

The RTC argues that what saved the claims in *Interfirst* from contingency was the FDIC's stipulation of fraud and gross negligence as to the loans at issue. Likewise, in *United States National Bank* the Ninth Circuit noted that *"[s]ince fraud was assumed for the summary judgment motion,* the liability was absolute and certain in amount when the suit was filed." 685 F.2d at 276 (emphasis added). However, the Court is not persuaded that Grant County's claim was contingent merely because fraud was not stipulated, assumed, or adjudicated.

Unlike *Interfirst* and *United States National,* where both the right of rescission based on pre-insolvency fraud and the right of offset were asserted after insolvency, Grant County claimed its right of rescission *before* insolvency, and then asserted its right to setoff post-insolvency. Grant County did all it could do to pursue its claim of rescission for fraud against Savers Federal before Savers was placed into receivership. The unfortunate timing of the insolvency in relation to the trial of the fraud claim should not work to deprive Grant County of its right to setoff.

The terms of the settlement agreement provided that the RTC would issue a Receiver's Certificate in favor of Grant County in the sum of $490,859.24—the exact amount Grant County originally gave for the Woodlake Manor loan participation. In return, Grant County reconveyed all of its interest in the Woodlake Manor project to the RTC as Receiver for Savers Federal. These actions are the fruit of a rescission of the loan participation contract.

Grant County filed its complaint against Savers Federal on the heels of a decision rendered in *First Federal Sav. & Loan Ass'n of Harrison, Arkansas v. Savers Federal Sav. & Loan Ass'n of Little Rock, Arkansas,* No. 86–11073, (Cir.Ct.Pul.Co. Ark., April 18, 1988), finding Savers Federal guilty of constructive fraud and breach of fiduciary toward another participant in the Woodlake Manor loan. *See* Easley Aff., Exhibit D. Of course, neither Grant County nor the RTC were parties to that litigation and, accordingly, the judgment has no preclusive effect on this case. However, it does illustrate that Grant County had a substantial good faith basis for its subsequent lawsuit against Savers Federal on the same issues. Thus, even though the settlement agreement contained "boilerplate" language denying liability, it obviously was made in contemplation of Grant County's potential success on its rescission claim.

The present case may be analogized, albeit imperfectly, to the Tenth Circuit's decision in *Liberty National Bank* allowing two beneficiary banks to set off claims on standby letters of credit against the issuing bank's correspondent accounts. The court determined that the beneficiary banks properly set off their claims against the correspondent accounts, even though the banks made no demand on letters of credit until after the issuing bank's insolvency. The FDIC argued that because the banks had not yet demanded payment under the letters of credit on the date of the insolvency, the insolvent's indebtedness was not "due and owing." However, as the Tenth Circuit noted, this requirement is relaxed on equitable grounds in cases of insolvency. *See, e.g., Scott v. Armstrong,* 146 U.S. 499, 13 S.Ct. 148, 36 L.Ed. 1059 (1892) (bank's creditor was permitted to set off its own debt certain in amount but not yet due against its deposit account at the bank); *Kasparek v. Liberty Nat'l Bank,* 170 Okl. 207, 209, 39 P.2d 127, 129 (1934) ("insolvency renders all debts due and furnishes of

itself a sufficient ground for setoff"). The court of appeals also rejected the FDIC's contention that the claims were "contingent" because the right to draw on the letters of credit was "not in any way dependent on events occurring after insolvency." 806 F.2d at 968.

Equity likewise favors recognition of liability on Grant County's claim as absolute and certain in amount, rather than dependent on events occurring subsequent to insolvency. Grant County's fraud claim is no more contingent due to a post-insolvency settlement than the fraud claims in *Interfirst* and *United States National Bank* were contingent due to post-insolvency stipulations or assumptions.

In addition, the settlement agreement provides that "the claim of Grant County evidenced by the Certificate shall be deemed a proven claim within the meaning of 12 U.S.C. § 1821(d)(5)(B)." Plaintiff's Complaint, Exhibit B, ¶ 1. Section 1821(d)(5)(B) states that "[t]he receiver shall allow any claim received on or before the date specified in the notice published ... by the receiver from any claimant which is proved to the satisfaction of the receiver." The claims identified in section 1821(d)(3)–(5) belong to creditors of failed depository institution. 12 U.S.C. § 1821(d)(3)(B)(i). Since " '[i]t is well settled that the rights and liabilities of a bank and the bank's debtors and creditors are fixed at the declaration of the bank's insolvency,' " *Northwest Racquet Swim & Health Clubs, Inc. v. RTC*, 927 F.2d 355, 360 n. 14 (8th Cir.1991) (quoting *American Nat'l Bank v. FDIC*, 710 F.2d 1528, 1540 (11th Cir.1983) (citations omitted)), a "proven" claim under section 1821(d)(5)(B) must be one that is "fixed" at the time of insolvency. The fact that the RTC as Conservator, against whom Grant County now seeks an offset, did not agree that the claim was proven (only RTC as Receiver agreed) is irrelevant to determining the nature of Grant County's claim at insolvency.

Once Grant County's rescission claim is established as certain rather than contingent, it cannot seriously be argued that the claims were not held in the same capacity, thus lacking the required mutuality. Both claims arose out of loan participation agreements between Grant County and Savers Federal. The Court therefore finds that the debts were held in the same right and may be set off against each other.

*B. Section 1823(e) and* D'Oench

■ The RTC contends that even if Grant County had a legitimate claim against Savers Federal at the time it was placed into receivership, Grant County's ability to assert its claim in setoff against its obligations to the RTC as Receiver for Savers Federal which were transferred to Savers Savings is barred by 12 U.S.C. § 1823(e) and federal common law emanating from *D'Oench, Duhme & Company, Inc.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its progeny.

Section 1823(e), applicable to the RTC under 12 U.S.C. § 1441a(b)(4), provides:

No agreement which tends to diminish or defeat the interest of the [Federal Deposit Insurance] Corporation in any asset acquired by it ... either as security for a loan or by purchase or as receiver of any depository institution, shall be valid against the Corporation unless such agreement—(1) is in writing, (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) has been, continuously, from the time of its execution, an official record of the depository institution.

This section gives statutory backing to the holding of *D'Oench* that oral side agreements do not bind the FDIC. *See Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*, 885 F.2d 266, 274 (5th Cir.1989) (since section 1823(e) is a codification of *D'Oench* and its progeny, the aims of § 1823(e) and *D'Oench* are identical). In *D'Oench* the FDIC acquired a note in a

purchase and assumption transaction. The maker asserted a defense based on an undisclosed agreement between it and the failed bank that the note would not be called for payment. The Court held that this "secret agreement" could not be a defense to suit by the FDIC because it would tend to deceive the banking authorities. Judge Easterbrook commented in *FDIC v. State Bank of Virden*, 893 F.2d 139, 143 (7th Cir.1990), on the rationale supporting this rule:

> Bank regulators and insurers must be able to rely on the bank's books, both to determine whether it is solvent in the first place and to value its assets at the time of a P & A [purchase & assumption] if it fails. Collateral agreements—such as the bank's promise in *D'Oench* not to collect the note—may be enforced against the persons who made them, but not against the FDIC.

Section 1823(e) may interdict a setoff even though it may be permissible under other federal or state law. In *Virden*, a case with facts similar to those here, the FDIC–Corporate sought payment from a bank on a loan participation agreement with the insolvent bank. The participating bank attempted to set off that debt against debt arising from another loan participation agreement with the insolvent bank which the participating bank had rescinded prior to insolvency due to fraud. In refusing to allow the offset, Judge Easterbrook wrote:

> Lies are representations of the insolvent bank, and to the extent the bank represents that it is bound to act as if its representations were true, it has made an agreement (a warranty) not represented on its books. Rescission producing a setoff holds the bank to this unwritten agreement, exactly what § 1823(e) says may not happen.

893 F.2d at 139. His logic was simple: setoff depends on rescission of the participation agreement; rescission depends on proving that the written agreements were false and that oral statements to the contrary were made; section 1823(e) prevents that demonstration. *Id.* at 144.

To support this conclusion, Judge Easterbrook looked to *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), in which the Supreme Court applied section 1823(e) to bar the defense that a note which the FDIC sought to enforce had been procured by fraud in the inducement. The failed bank made oral misrepresentations to its customer concerning the loan terms and property to be purchased, and the customer maintained that such misrepresentations are not "agreements." A unanimous Court held that because oral representations, even if fraudulent, could have been expressed as written warranties, section 1823(e) applies. Recalling that *D'Oench* itself dealt with a note whose maker "lent himself to a scheme or arrangement whereby the banking authority ... was likely to be misled," the Court reasoned:

> Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of performance of a counterpromise (as in *D'Oench, Duhme*) or of the truthfulness of the warranted fact.

*Langley*, 484 U.S. at 93, 108 S.Ct. at 402. *See also FDIC v. Texarkana Nat'l Bank*, 874 F.2d 264 (5th Cir.1989) (fraudulent representations by failed bank's officers which induced participating bank's purchase of loan agreements were "agreements" within the meaning of section 1823(e) and barred participating bank from asserting a setoff based on those representations). Judge Easterbrook acknowledged that the *Langley* holding "may allow fraud to triumph, by denying the borrower a defense that it would have had if the suit had been brought by the failed bank rather than the FDIC, [but] the borrower bears much of the blame. One who relies on an oral promise puts others at risk." *Virden*, 893 F.2d at 143–44.

But Grant County didn't claim that Savers Federal's misrepresentations induced it to participate in the Woodlake Manor loan; rather, Grant County maintains that Savers Federal failed to disclose that subsequent

appraisals had reduced the value of the loan collateral. If lies are "agreements" under section 1823(e), what about material omissions? Judge Easterbrook's answer: "If the debtor can't use the bank's lies to block repayment, it can't use material omissions either—for the half-truth is one form of lie." *Id.* at 144. In *FDIC v. Bell*, 892 F.2d 64, 66 (10th Cir.1989), *cert. dismissed*, —— U.S. ——, 110 S.Ct. 2607, 110 L.Ed.2d 286 (1990), the Tenth Circuit also considered this question and concluded that

> [s]ince the Court [in *Langley*] included fraudulent warranties within the definition of "agreement" without circumscribing fraud to overt acts, we see no basis for concluding one form of fraud is governed by § 1823(e) while another is not. If fraudulent warranties fall within the reach of the statute, it is irrelevant whether the fraud was caused by overt misrepresentation or deceitful omission.

Despite the foregoing, the Court finds the application of section 1823(e) and the *D'Oench* doctrine to these facts both unwarranted and undesirable. *Langley* involved oral misrepresentations, not material omissions. The makers' defense against the note was that the bank made certain unrecorded warranties regarding the land purchased, the truthfulness of which was a condition to performance of their obligation to repay the loan. The Supreme Court considered the question whether the word "agreement" in section 1823(e) encompassed only an express promise to perform an act in the future. Rejecting such a narrow definition, the Court held that the word also embraced a condition for performance, "whether the condition consists of performance of a counterpromise (as in *D'Oench, Duhme*) or of the truthfulness of a warranted fact." 484 U.S. at 93, 108 S.Ct. at 402.

Unlike the Tenth Circuit in *Bell*, this Court does not read *Langley* to require including fraudulent *omissions* within the definition of "agreement." That question was not before the Supreme Court, nor does the Court's reasoning even suggest such a construction. An omission cannot be an "agreement" because there is nothing on the table to agree to; no promise, condition, or warranty is made. Indeed, how can the unenlightened party agree to something he knows nothing about?

It does not follow that because one form of fraud is governed by section 1823(e), other forms of fraud are likewise included. The question under section 1823(e) is not whether something is "fraudulent," but whether something is an "agreement." In *Langley* Justice Scalia said an "agreement" includes not only a promise to perform a future act, but also any condition or warranty, the truthfulness of which is a condition precedent to performance of the contract. This he surmised from the way the term "agreement" is used in commercial and contract law. *See* 484 U.S. at 91, 108 S.Ct. at 401. However, such a promise or condition presupposes some sort of communication between the parties. One cannot strike a bargain if he fails to disclose his terms. Even in those instances where silence can be construed as implicit acceptance or rejection, the one who communicates by silence must be aware of the proposed terms or conditions. In addition, an "agreement" under section 1823(e) contemplates a promise or condition that could have and should have been put in writing. How can a material omission be put in writing?

An omission often is deceitful because it renders a previous affirmation false. The Loan Participation Sale and Trust Agreement between Savers Federal and Grant County provided that Savers was to act as trustee and fiduciary in its handling of Grant County's funds and in its general dealings with Grant County. Easley Aff., Exhibit B, ¶¶ 6–7. Similar language appeared in the participation agreement in *Royal Bank of Canada v. FDIC*, 733 F.Supp. 1091 (N.D.Tex.1990). When the participating bank sued the FDIC as receiver of the lead bank, *inter alia*, for breach of contract arising out of the lead bank's misapplication of funds and failure to disclose material information, the FDIC raised *D'Oench* as a defense. In rejecting the application of *D'Oench*, the court reasoned:

> RBC does not rely upon side agreements that are not contained in the pertinent

bank files to support its claims. The entirety of the agreement is contained in the participation certificate; hence, proof of the agreement does not require resort to oral representations. That proof of breach of the agreement may require resort to evidence not contained in [the insolvent bank's] files does not bring the rule of estoppel into play. *D'Oench, Duhme* cannot reasonably be understood to require that evidence of the breach of an agreement be contained in a bank's file. It is instead the undisclosed existence of the agreement and its terms that is held to mislead bank examiners. RBC predicates its claims upon the written participation agreement found in [the insolvent bank's] files. Because the contractual duty was reduced to written terms and was at all pertinent times in the relevant files, the court discerns no basis for applying *D'Oench, Duhme.*

733 F.Supp. at 1098. Likewise, the warranty rendered false by Savers Federal's omission was a part of the written participation agreement between Savers Federal and Grant County.

The *D'Oench* doctrine typically applies where a person, usually a borrower, is a party to a transaction that misleads the FDIC (or, as in this case, the RTC). *D'Oench* was decided on the narrow ground that an accommodation maker who executes a *secret agreement* may not take advantage "of an undisclosed and fraudulent arrangement which [public policy] condemns and which the maker of the note *made possible.*" 315 U.S. at 461, 62 S.Ct. at 681 (emphasis added). Although the estoppel doctrine may apply even though the maker did not intend to deceive creditors or depositors, there at least must be a showing that "the maker lent himself to a scheme or arrangement whereby the banking authority ... was or was likely to be misled." *Id.* at 460, 62 S.Ct. at 681.

Such was the situation in *Virden* and *Langley.* In *Virden,* when the FDIC examined the insolvent bank's books, it saw this language in the participation agreement:

Participating Bank has made an independent investigation of Borrower, on which Participating Bank solely relied in extending credit by virtue of its participation in said loan, or has waived such investigation; [and] the undersigned [the insolvent bank] makes no representation or warranty, and assumes no responsibility, of any kind or character to Participating Bank with respect to the validity, regularity, collectibility or enforceability of the loan, or any security therefor....

893 F.2d at 144. However, the participating bank later rescinded the agreement because it believed the lead bank had lied to it about the insolvency and priority of the loan and had kept silent about other material facts. The court applied section 1823(e) (codifying *D'Oench* ) and held that the participating bank's setoff based on rescission was invalid "because it depends on contradicting the documents with oral statements." *Id.*

Here, Grant County's setoff depends on rescission of the written participation agreement, and rescission of the participation agreement depends on constructive fraud by material nondisclosure and substantial nonperformance by breach of fiduciary duty, both of which arise from Savers Federal's failure to disclose the subsequent appraisals which affected the creditworthiness of the loan. Grant County neither was a party to nor made possible the underlying transaction that gave rise to the claim of rescission, *cf. FDIC v. Meo,* 505 F.2d 790 (9th Cir.1974), nor does it assert that Savers Federal made oral statements contradicting the participation agreement. Indeed, rescission is not claimed on the basis of any "secret agreement," oral statement, condition, or warranty made by Savers Federal. The Court therefore finds that neither section 1823(e) nor *D'Oench* bars the validity of the setoff Grant County asserts.

*C. Validity of Claim Asserted Against RTC as Conservator*

█ It is undisputed that the purchase and assumption agreement between Savers Federal and Savers Savings transferred the Other Projects to Savers Savings, but left

the Woodlake Manor project in the hands of the RTC as Receiver for Savers Federal. Therefore, even if Grant County does have a right to setoff, the RTC says that it can only be asserted against assets held by the Receiver for Savers Federal, and not against obligations due to a third party—in this case, the RTC as Conservator of Savers Savings.

The enabling statutes authorize the FDIC and the RTC to act in separate and distinct capacities, such as conservator or receiver for a failed institution. *See, e.g.,* 12 U.S.C. § 1821(c)(2)(A). Due to the different capacities in which the FDIC and the RTC may act, courts have recognized that each capacity is a separate legal entity. *See, e.g., FDIC v. La Rambla Shopping Center,* 791 F.2d 215, 219 (1st Cir.1986). Accordingly, the RTC reasons, any claims arising out of conduct by Savers Federal are only assertable against the RTC in its capacity as Receiver for Savers Federal.

The RTC cites cases such as *Trigo v. FDIC,* 847 F.2d 1499 (11th Cir.1988), *FDIC v. La Rambla Shopping Center,* 791 F.2d 215 (1st Cir.1986), and *Santopadre v. Pelican Homestead Sav. Ass'n,* 741 F.Supp. 1252 (E.D.La.1990), to show that Grant County's offset cannot be applied to obligations due the RTC as Conservator. However, none of these cases involve a setoff due to insolvency.

It is true that the RTC as Receiver is the successor to Savers Federal's liabilities unless expressly designated otherwise. Neither the RTC as Conservator for Savers Savings nor a subsequent acquiror is required to assume liabilities related to the assets they agree to purchase, and neither can be held liable for obligations they have not assumed. *See* 12 U.S.C. § 1821(d)(2)(F)(i); *Payne v. Security Sav. & Loan Ass'n, F.A.,* 924 F.2d 109, 111 (7th Cir.1991); *FSLIC v. Locke,* 718 F.Supp. 573, 580 (W.D.Tex.1989). However, a setoff may have the effect of reducing the insolvent's assets prior to their transfer under a purchase and assumption agreement. The right of setoff is fixed at the moment of the bank's insolvency, *Dakin v. Bayly,* 290 U.S. 143, 148, 54 S.Ct. 113, 115,

78 L.Ed. 229 (1933); thus, "[w]here a setoff is otherwise valid ... it is clear that it is only the balance, if any, after the setoff is deducted which can justly be held to form part of the assets of the insolvent," *Scott v. Armstrong,* 146 U.S. 499, 510, 13 S.Ct. 148, 36 L.Ed. 1059 (1892). The Seventh Circuit in *Virden* also recognized that the "FDIC–Receiver succeeded to the interests [the failed bank] possessed under state law, and it transferred to FDIC–Corporate only what it had." 893 F.2d at 139. *See also FDIC v. Liberty Nat'l Bank & Trust Co.,* 806 F.2d 961, 967 (10th Cir.1986) ("[o]nly the balance, if any, after the setoff is deducted is considered an asset of the receivership").

In response to *Scott,* the RTC argues that Grant County failed to *exercise* any right of setoff prior to the transfer of the Other Projects to Savers Savings. The RTC agrees that cases such as *Interfirst* and *United States National* recognize the validity of a post-insolvency exercise of the right of setoff, but points out that these cases do not involve the assertion of the right against assets held by a third party purchaser after the assets were purchased. To allow a post-*transfer* offset, says the RTC, "would interject a level of uncertainty in attempts to resolve failed institutions which could not have been intended by Congress [under FIRREA]," and "would also impede the ability of federal regulators to quickly analyze the assets and liabilities of the failed thrift for purposes of determining whether to liquidate the institution or arrange a purchase and assumption transaction." Brief in Support of Response to Plaintiff's Motion for Summary Judgment at 12.

A right of setoff arising at the moment of insolvency, of course, can only be asserted or exercised after insolvency. The RTC suggests, however, that a debtor must exercise his right of setoff before the assets of the insolvent bank are transferred to a third party, or forfeit that right. The facts in the present case reveal the harshness of such a rule: the assets of Savers Federal were transferred to Savers Savings *one day* after Savers Federal went into receivership.

The Court is not persuaded that Grant County's failure to assert its right of setoff at that time should prevent Grant County from prevailing in this action. Setoff is an equitable remedy. *FDIC v. Mademoiselle of California,* 379 F.2d 660, 662 (9th Cir. 1967). If Grant County had the right to set off its claims against the amounts it owed Savers Federal on the Other Projects, its subsequent exercise of that right is proper. On the other hand, if Grant County unreasonably or improperly had delayed in claiming setoff, laches could bar recovery; however, the Court finds no such delay here.

The Supreme Court noted in *Scott* that the distribution of the assets of the insolvent bank must, of necessity, come "from what belongs to the bank, and that which at the time of insolvency belongs of right to the debtor does not belong to the bank." 146 U.S. at 510, 13 S.Ct. at 151. At the time of Savers Federal's insolvency, Grant County owed Savers Federal $211,012.10 for expenses in connection with the Other Projects, and had asserted its right to rescind the Woodlake Manor participation agreement under which it paid Savers Federal $490,859.24. These debts were mutual, certain, and subject to setoff. As *Scott* instructs, after deducting the setoff there were no receivables related on the Other Projects that could have been transferred to a third party. The Court therefore finds that while the RTC as Conservator did not assume any liability related to the Woodlake Manor agreement, it also did not succeed to any amounts due and owing by Grant County for expenses on the Other Projects.

The RTC further suggests that permitting Grant County to assert its claims against the Conservator for Savers Savings violates 12 U.S.C. § 1821(i)(2), which provides:

The maximum liability of the Corporation, acting as receiver or in any other capacity, to any person having a claim against the receiver or the insured depository institution for which the receiver is appointed shall equal the amount such claimant would have received if the Corporation had liquidated the assets and liabilities of such institution without exercising the Corporation's authority under subsection (n) of this section or Section 13.

The RTC concedes that any recovery by Grant County on its Receiver's Certificate would be less than 100% because of Savers Federal's insolvency. Brief in Support of Motion for Summary Judgment at 17. Thus, "[i]f the Plaintiff is allowed to assert its offset claim against the Conservator, it could, in effect, recover more than its claim against the assets of Savers Federal thereby transgressing the limitations of § 1821(i)(2)." *Id.* at 18 (footnote omitted).

This argument also must be rejected. First, the setoff asserted here is not for the full amount of the Receiver's Certificate. Second, the setoff effectively gives Grant County the status of a secured creditor to the extent of the amounts it owed to Savers Federal for expenses relating to the Other Projects. Thus, Grant County would expect to recover at least as much if Savers Federal had been liquidated. As the Tenth Circuit observed in *Liberty National Bank:*

We recognize that setoff in cases of insolvency effectively gives secured status to an otherwise unsecured creditor, to the extent of that creditor's indebtedness to the insolvent. Therefore we are tempted to use formal distinctions, such as the failure to make demand before the bank is insolvent, to restrict the use of setoff as much as possible. But the preferential aspect of setoff has long been understood to be justified by the inequity inherent in requiring those who have dealt with insolvents to pay their debts in full while receiving only a fraction of their claims in return. *Blount v. Windley,* 95 U.S. (5 Otto) 173, 177, 24 L.Ed. 424, 426 (1877). "The equity of equality among creditors is either found inapplicable to such set-offs or yields to their superior equity." *Scott,* 146 U.S. at 511, 13 S.Ct. at 152, 36 L.Ed. at 1063.

806 F.2d at 969.

*D. The Language of the Settlement Agreement*

The RTC's last hope is found in the language of the Settlement and Release

Agreement releasing both the RTC as Receiver and the RTC as Conservator from "any and all claims, demands, liabilities, controversies or causes of action, of whatsoever nature, in law or in equity, which Grant County has or may have arising out of or relating to the facts and claims set forth in the [settled] Action or otherwise with respect to the [Woodlake Manor] Project." Plaintiff's Complaint, Exhibit B, ¶ 4.

 Although parties may contract away their rights of setoff, "an agreement must be clear and specific to deprive a party of the ordinary right of set-off." *Updike v. Oakland Motor Car Co.*, 53 F.2d 369, 373 (2d Cir.1931). The "boilerplate" language of the settlement agreement in this instance does not clearly indicate that Grant County is waiving any right to set-off. Moreover, as Grant County suggests, "[s]urely, the RTC would not argue that the Settlement Agreement and Release prevented Grant County from collecting on the Receiver's Certificate it was issued pursuant to the release, but the argument it now makes that Grant County is prevented from collecting its claim through set off is no less absurd." Brief in Support of Motion for Summary Judgment at 15.

### III. CONCLUSION

For the foregoing reasons, the Court hereby grants the plaintiff's motion for summary judgment and denies the defendants' motions for summary judgment. The Court directs the RTC to offset against its Receiver's Certificate those expenses charged to Grant County arising from the participation loans as set forth above, and to refund any and all amounts withheld by the RTC for such expenses.

IT IS SO ORDERED.